UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                                                          Chapter 13
John Tekavec,                                                                          Case No. 12-26083-svk
      Debtor.

**MEMORANDUM DECISION
ON NORTH SHORE BANK'S OBJECTION TO CONFIRMATION**

The issue in this case is whether John Tekavec (the "Debtor") can use the Bankruptcy Code exception for short-term mortgages to cram down the second mortgage claim on his personal residence.[1] The facts are simple and undisputed.

On March 15, 2006, the Debtor and North Shore Bank (the "Bank") entered into a Home Equity Line of Credit Consumer Open-End Agreement (the "Agreement"), under which the Bank agreed to advance up to $119,500. The term of the Agreement was from March 15, 2006 through the "Maturity Date," defined as March 15, 2009. Paragraph 6.D states: "At maturity, I will repay the entire outstanding Loan Account Balance in a single payment. At that time you may, but are not obligated to, refinance this Line of Credit." Paragraph 8 provides: "Following the initial 3 year draw period, this Agreement will automatically be extended from year to year unless lender gives me notice to the contrary at least 30 days prior to the end of the initial 3 year draw period or the annual anniversary of such extension." To secure the obligations under the Agreement, the Debtor granted the Bank a second mortgage on his residence.

On April 26, 2012, the Debtor filed a Chapter 13 petition. His plan values the Bank's allowed secured claim at $11,800, and proposes to pay that amount over 60 months with interest

---

[1] "Cram down" is bankruptcy slang for bifurcating a secured claim into secured and unsecured portions. Under Bankruptcy Code § 506, a creditor's claim is only considered secured to the value of the collateral and is unsecured for the balance. A creditor whose claim exceeds the value of the corresponding collateral is said to be "undersecured" and, under some circumstances, the debtor can cram down such a claim.

at 4.25%. The balance of the Bank's claim will be treated as unsecured and paid not less than 1%. The Debtor's valuation is supported by a "comparative market analysis" of the property of $181,500, and the balance on the first mortgage of $169,700. The Bank objected to confirmation of the plan, claiming that the full amount of its $117,088.52 claim must be paid in full, or alternatively arguing that the Debtor's valuation is too low. In its proof of claim, the Bank valued the property at $256,600.

    The Bank cites § 1322(b)(2) of the Bankruptcy Code, which provides:

> (b) Subject to subsections (a) and (c) of this section, the plan may--
> . . .
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

    The Debtor counters that the exception of Bankruptcy Code §1322(c)(2) applies to the Agreement. That section provides:

> (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law--
> . . .
> (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to § 1325(a)(5) of this title.

    Section 1322(c)(2) permits a debtor to bifurcate an undersecured mortgage claim on the debtor's principal residence when the last payment on the original payment schedule is due before the final payment under the Chapter 13 plan. *In re Amos*, 259 B.R. 317, 319-20 (Bankr. C.D. Ill. 2001).[2] Here, the Bank argues that given the Agreement's automatic extension

---

[2] In *Witt v. United Cos. Lending Corp. (In re Witt)*, 113 F.3d 508 (4th Cir. 1997), the Fourth Circuit found § 1322(c)(2) ambiguous and held that a debtor could not bifurcate a short-term undersecured mortgage claim under that section. This Court disagrees, finding that such a reading of § 1322(c)(2) "tortures the words used by Congress, makes a mess of several other well-settled provisions of

2

provision, the last payment cannot be due before the date on which the final payment under the plan is due. The Debtor responds that the original maturity date and balloon payment feature of the Agreement fit squarely within the definition of the "last payment on the original payment schedule."

In *In re Rowe*, 239 B.R. 44, 51 (Bankr. D.N.J. 1999), the court examined the purpose and history of § 1322(c)(2) and noted that the words "original payment schedule" encompass "only mortgages that mature prior to the last payment under the plan. Thus only short term mortgages, mortgages with balloon payments maturing before the date on which the last payment under the plan is due and long term mortgages maturing prior to the date on which the last payment under the plan is due are within the scope of § 1322(c)(2)." By contrast, courts do not extend § 1322(c)(2) to cases in which a default or mortgage foreclosure accelerated the mortgage. *Amos*, 259 B.R. at 319-20; *see also In re Anderson*, 458 B.R. 494, 502-03 (Bankr. E.D. Wis. 2011) ("The last payment on the original debt in this case would have been April 1, 2037. The mortgage was accelerated by default and the foreclosure judgment creates a new due date, but it does not change the *original* date. *See, e.g.*, *In re Rowe*, 239 B.R. 44 (Bankr. D.N.J. 1999). Section 1322(c)(2) does not apply in this case."). The court in *In re Bagne*, 219 B.R. 272, 277 (Bankr. E.D. Cal. 1998), explained: "The preference afforded home mortgagees is an exception to this rule [allowing for modification of interest rates], but one that Congress felt was necessary to encourage the flow of money into the housing market at low interest rates. . . . The loans described in § 1322(c)(2), however, are of an entirely different nature. These short-term, high-interest rate home equity loans are more akin to consumer financing than to traditional home lending."

---

the Code and trumps the plain language of the statute with the ambiguous silence of legislative history." *First Union Mortg. Corp. v. Eubanks (In re Eubanks)*, 219 B.R. 468, 471 (B.A.P. 6th Cir. 1998).

3

Case 12-26083-svk    Doc 16    Filed 08/15/12    Page 3 of 4

The Bank has not cited nor did the Court's research uncover a case in which a short-term but extendable home equity line of credit was considered to stretch beyond the final payment date of a Chapter 13 plan.[3] The Court is persuaded by the Debtor's argument: the Agreement contains an expressly defined maturity date of March 15, 2009, which is the last payment date "on the *original* payment schedule." The Agreement itself notes that the "initial" term may be extended. In this context, "original" as used in the statute and "initial" as used in the Agreement are synonymous. In analyzing a statute, the Court must give meaning to each term. *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 724 (2011). If the Court accepts the construction urged by the Bank, the word "original" in § 1322(c)(2) would be rendered meaningless. The Court concludes that the extension of the repayment period at the Bank's sole option does not change the original repayment period under the Agreement.

Accordingly, the last payment on the original repayment schedule was due before the final payment under the Debtor's plan is due, and the plan may provide for the bifurcation of the Bank's claim into secured and unsecured components. The Bank's Objection to Confirmation on this basis is overruled. If the parties are unable to agree on the valuation of the Debtor's residence, they should contact the Court to schedule an evidentiary hearing.

Dated: August 15, 2012

By the Court:

*Susan V. Kelley*
Susan V. Kelley
U.S. Bankruptcy Judge

---

[3] The debtors in *In re McCullum*, 2008 Bankr. LEXIS 2531 (Bankr. S.D. Ohio Sept. 23, 2008), argued that their home equity line of credit fit within the § 1322(c)(2) exception, but the agreement in that case clearly provided for a 15-year term of payments that extended beyond the final payment date of the plan.